1922 Wesleyan Company v. Army Is Mr. Morehouse in the courtroom? He better do so very quickly Are you Mr. Morehouse? Yes, Your Honor We're waiting for you to begin your argument. Good morning, Your Honors. May it please the Court. I am Richard Morehouse of the law firm Greenberg-Trarig, representing the appellant, Wesleyan Company, in this matter. Did Wesleyan have prior dealings with any agency of the Department of Defense or any military service? Not before they submitted the unsolicited proposal, that is correct. In 1983, that is correct. Wesleyan was a small, independent inventor and contractor who came up with the idea of an on-the-move hydration system for use with the chemical mask and the chemical biological suit. Do you think that because of the background of the company that they're entitled to be treated under a different legal standard in terms of prudent conduct? Or do you think that they are covered by the same standard that would be typical of the industry as a whole? As a large contractor, I think they are governed by the same standard, legal standard, but I think there has to be a degree of deference, reasonable deference, and flexibility regarding their particular situation versus a very large industrial contractor. It's the same, but it's different? Well, I don't want to create a tautology here. It is the same legal standard, yes, but at the same time, if there is any doubt and there is any shading of gray, it should be resolved. Here's what concerned me. When the Army insisted, after receiving the initial submission from the Wesleyan Company, that there be certain formalities about the protection and ownership of the data contained in the submissions, Wesleyan complied, and there were memos of understanding, there were policy statements, there were other documents, there were legends incorporating defense acquisition regulations. That is correct. And so with or without prior experience, the leaders at Wesleyan were given to understand that if they wanted their data protected, they had to observe certain formalities, and they did. That's correct. But then at the later stage where it shifted from submitting documents to submitting the actual system, drinking system, suddenly the formalities disappear, and nowhere can I find in the record any correspondence or any new document whereby, for example, Wesleyan could have said to the Army, well, you've asked us to turn over 12 of these devices, and we're happy to do that, and you're even going to pay for them, and that's appreciated. And by the way, we assume that the same confidentiality provisions that covered our earlier relationship when we just submitted data will continue, and if you agree, we'll send you the devices. But if you don't agree, Army representatives, we can't send you these devices because they incorporate trade secrets. Now, am I right that there was no such documentation of any expectation of secrecy in the stage where the devices were procured? The prototypes. Wesleyan's president, Mr. Schneider, actually testified during his deposition that it recalls that a lot of the prototypes were marked with a particular tag. If the board had conducted an evidentiary hearing on its question of jurisdiction, we would have had his testimony. I'm not following you. What do you mean a particular tag? A particular tag to certain prototypes marking that Wesleyan had reserved its rights to its proprietary information. Was printing on the tag on each device? Handwritten on the tag in many cases, yes. Handwritten, but still readable on the tag? Yes, sir. Do you know what they said? Yes, I do, and if I may. Is it in the record, or are you going to testify here as if you are a trial court? We alluded to it because we did not want to attempt to introduce new evidence, but we did allude to it in our reply brief that the board had not conducted an evidentiary hearing to see, in fact, if there was any other information. Now, we had conducted an extensive FOIA discovery before we went to litigation. We had conducted extensive discovery during the board litigation. Let me just get back on the track I was trying to pursue. Other than what may have been written on the tag, which is not in the record, was there any correspondence or new memo of understanding or other formal document dealing with secrecy in the stage where the devices were being sent to the Natick lab? Other than the purchase order, which you can relate back to the memorandum of understanding, which I was going to argue at that point, no, there is not a particular piece of correspondence that we are aware of. Nor a renewed memorandum of understanding. No, but the memorandum of understanding does say it would be superseded by any resulting contract. And there is nothing in the purchase orders that is inconsistent with or contradicts the understanding that is in the memorandum of understanding to protect the confidentiality. Well, the government argues that the memorandum of understanding is limited by its terms to data, words, drawings, things like that, in the original documentary submission as opposed to copies of the device itself as were later sent on request to the Natick lab. What is your response to that distinction that the government seeks to draw? Well, I think that's an artificial distinction or a manufactured distinction because I think a reasonable test would have to assume that if Wesleyan had gone to all of these lengths to protect the information in the unsolicited proposal, that his understanding was, or its understanding was, that it would extend to the prototypes. The board reached an unreasonable conclusion by saying, because we don't see a piece of paper, therefore we must conclude that there is a grand canyon between the concept on paper and the concept embodied in the prototype. That is not the most reasonable reading of the record. And if they had doubts on that, Your Honor, they should have resolved it through testimony and additional evidence before they decided to do it. This case was resolved by the board on summary judgment? No, it was resolved. There was originally the cross motion for summary judgment. The government, represented at that time by Army Council, had argued this was really a patent case. There was a decision on summary judgment where the board ruled that in one instance, post-patent disclosure... So it's in front of us as a motion to dismiss rather than summary judgment. It was a sua sponte decision by the board to address its issue of jurisdiction some two and a half years after the case was filed. But did you ask for a hearing to present factual evidence in conjunction with the then pending invited motion to dismiss for lack of jurisdiction? The invitation for the motion to dismiss came about one month before the trial on the merits was scheduled. You're not answering my question. When the motion was filed, as invited by the board, filed by the government, did you lodge an objection that before that motion could be decided, there would have to be an evidentiary hearing because there were some fact issues embedded in the jurisdictional issue? No, because we did not know the basis of where the board was going. Because we understood that the board was grappling with its E.M. Scott, to some extent was grappling with its E.M. Scott precedent. It was not grappling with the issue of whether or not there was a... When you got the decision of the board, did you seek reconsideration and ask to have an evidentiary hearing so that you could present evidence, for example, about these tags and what they said? Because at that time we were not aware of the existence of the tag. So the answer is no. The answer is no. But now you want us to turn this case on tags that were not in evidence below and are not even in the appendix before us. We don't know what it says. Well, I understand that, Your Honor, but the point is there were over 130 prototypes that were delivered. Those tags, if they still exist, would be in the possession of the Army, which should have been produced during discovery at the board, if not during the FOIA process. Did your discovery request the tags? We requested all information that there was bearing upon everything related to the unsolicited proposal, to the purchase orders, and to the prototypes. And in fact, Wesleyan, even to some extent, was... Because we have a passage of almost 20 years, and in fact there has only been one tag that Wesleyan itself has been able to find in its files. Because if the tags exist, they are with the government. They're no longer with Wesleyan. But you didn't ask for the tags. Pardon me? You did not request the tags. I discovered because at the time we did not know the specific existence of the tags. Well, you didn't know it, but the client had to know it. I think the client basically, if I will, had forgotten it. But he did allude to it in his deposition, that there was some marking on those tags. Mr. Morehouse, why didn't you choose to file your suit in the Court of Federal Claims that has broader contract jurisdiction than a contract board, which is limited, as I recall, to the confines of the Contract Disputes Act only? All right. That's a fair question, Your Honor. There are two reasons for it. First of all, we believe this certainly was a Contract Disputes Act case because we pled in our complaint that there was the existence of express contracts for the purchase of those prototypes, and we listed those contract numbers in the complaint. There was always an express contract before the board. Our point is they had jurisdiction from day one. Now, whether or not how they decided it on the merits is one thing, but they had jurisdiction from day one because they had express contracts. But they certainly had jurisdiction over those sale contracts. So, for example, if the lab had declined to pay the stipulated price, there would have been a breach of the contract. But the government's position is that the preexisting secrecy contracts were separate and ended as of the time that the devices were being purchased. Well, that's not what the Memorandums of Understanding say on their face. They do not say that. They say they will be superseded by a follow-on contract, and the purchase orders were the follow-on contract. But there's nothing in the purchase orders that say that the Memorandum of Understanding is extinguished, modified, changed altogether. Why isn't it the other way around? Why wouldn't the purchase orders to continue and force the terms of the Memorandum of Understanding have had to say affirmatively, the prior Memorandum of Understanding continues in force and effect in connection with this purchase? First of all, there's no law that holds that. And number two, one of the essential issues has to be the mutual intent of the parties. In fact, at least two of those purchase orders are directed to a Mr. Snow at Natick, who in his deposition testified that he was aware of a confidentiality agreement protecting Wesleyan's property. Did the board rely on the deposition testimony of any of these persons as a foundation for its decision? No, because we did not have an evidentiary hearing on the question of jurisdiction. I do want to return to your point on the Court of Federal Claims, though. As we were deciding what forum to choose. But instead of that, do you want to consider reserving your remaining three minutes for rebuttal? Because it's a sort of academic question. You made a choice. The reason is why. Maybe you're none of my business. I will do that, Your Honor. Thank you, Mr. Morehouse. Thank you. Mr. Harrington. You, sir, were not the writer of this brief. Is that correct? That is correct, Your Honor. When did you enter this appeal? About a month ago, Your Honor. What happened to Ms. Hogan, who wrote the brief? Ms. Hogan is unavailable at this point. She is out of the office for this week and next week, and so was not available to conduct the oral argument here today. So you inherit her brief? Yes, Your Honor. On the final page, page 22, there's a sentence. It's the first full sentence on the page that I can't understand. Would you read it out loud slowly and distinctly, please? The first full sentence on page 22? The first full sentence at the top of page 22. The sentence says, The MOUs explicitly did not disclaim any promise to purchase any of the units. And I believe there is a typo in the sentence, Your Honor. Well, what is the correction that would make sense, and what is the sense intended? Essentially, Your Honor, the sentence is intended to point out that the memorandum of understanding didn't provide for or contemplate any future purchase of the device that was being submitted pursuant to the unsolicited order. Does that mean, then, that the words did not should be stricken? It does, Your Honor. Does anybody proofread these briefs at the Department of Justice anymore? Yes, Your Honor, they are proofread. By you? Well, I didn't personally proofread this one, Your Honor. I certainly proofread all of them that I submit. Unfortunately, here is an instance where something slipped through. If a Justice Department attorney inherits a brief with an error in it, why isn't it incumbent on that attorney to correct the error for the benefit of the court so we can understand what the Department's position is prior to showing up for the oral argument? Your Honor, this was, in our view, a relatively minor typographical error that could be easily explained during the course of oral argument, and it was for that reason that full new briefs were not submitted. All right. Please proceed. Your Honor, the Armed Services Board of Contract Appeals correctly dismissed this action for lack of jurisdiction. A Board of Contract Appeals does not possess jurisdiction to hear claims concerning all government contracts. We know that. This is ABCs. Let's not waste time talking about things that are not an issue. Mr. Morehouse essentially says there was an early contract for secrecy. There was a later contract to buy devices. That's a procurement contract. The earlier contract merges into and becomes part of the later contract. Therefore, the Board has jurisdiction over the merged two contracts. And you say, only on the final page of Ms. Hogan's brief, that no, the two things are totally separate. So the issue is, well, are they totally separate or not? And why would one think they're totally separate? Well, Your Honor, the starting point and the contract that counsel has referred to are purchase orders. There were purchase orders that were issued after the unsolicited proposals were made. Why is this a common sense of the situation that the parties both contemplated that the earlier secrecy agreement would continue and would protect the supply of the devices? Let me address, there are two components that I need to address, Your Honor. First, let's talk about the purchase orders and the plain language of the purchase orders. The purchase orders could have said something to that effect. They do not. They are silent on that. We understand the arguments, and what you say is quite factually accurate. We know what the document says. We have it. We've read it. We have it to refer to later if we have any memory problems. But it doesn't answer what the common sense of the situation between a defense contractor and an Army lab would be. Well, Your Honor, there is another aspect to this that was the second point I wanted to make, and that is If your position is common sense has nothing to do with it, they're technical legal rules, then just say so. But if common sense has a role, I would like to know why it isn't the common sense of this situation that both sides assumed that the secrecy protections would continue until the original submission was rejected, which didn't happen until after all these purchases of devices. Your Honor, what controls here is the language of the agreements. This Court has said time and time again that the plain language of the contract controls the contract interpretation. We have two documents. We have an MOU, and we have a purchase order. I'll call it a sales contract. Now, either they're totally separate, you win, or they're related and go together, you lose. So, see to me, you've got to address why one might logically think they merge together versus are totally separate. The reason that they do not merge together, to use Your Honor's language, is because the purchase orders do not provide for that. Let's talk about the memorandum of understanding. The memorandum of understanding, it's not our... It uses the word devices. The memorandum itself uses the word devices as well as data. So, dumb me, I read it, and I think, well, it protects data on paper, and it protects devices supplied to the Army for testing. That's what happened here. So the wording of the MOU seems to cover both data and devices, and the later purchase of 33 or so of these devices over several years would seem to fit in the scope of that document. Your Honor, we need to step back and recall that this is, first and foremost, a jurisdictional question, and the memorandum of understanding, standing alone, let's put aside the subsequent purchase orders, the memorandum of understanding, the disclaimers do not... So no board jurisdiction. You're absolutely right. The memo of understanding about secrecy, no board jurisdiction, clear as could be. But when there later is purchase of devices that are mentioned in the memo of understanding, why doesn't the memo of understanding ride along and merge into the purchase order? Well, Your Honor, the question fundamentally comes down to a question of breach. That is effectively what is being asserted here, that there was the breach of some agreement. If we are talking about breach, and we are talking about breach of the purchase orders, the purchase orders were fully complied with by the Army. Everybody agrees. The Army paid for the devices. He sent the devices. The question is whether if there were merger, the secrecy provisions, now part of the larger contract, were breached because allegedly the information about this secret technology was given out to some third parties. I don't know if that happened or not, but it doesn't make any difference. That's what's alleged here. So the whole thing seems to turn on whether these two written contracts merge or don't merge. You just say nakedly in your brief, they don't merge. They're totally separate. They're unrelated. They have nothing to do with each other.  Well, let's look at the purchase orders themselves, Your Honor. The purchase orders incorporate by reference a discussion about an oral price quote. They incorporate by reference certain other provisions. They do not incorporate by reference the memorandum of understanding. The parties knew how to incorporate these by reference. The memorandum of understanding doesn't have a termination date. There would be no reason for the leader of Westland that I can see to assume that the secrecy agreement had expired. It doesn't have an expiration date. And it's not limited to data. So now he's sending devices. Earlier he sent data, both covered by express terms of a MOU with no expiration date. I think if I were in his shoes, I would have assumed this secrecy agreement continues in force and effect, whether the purchase orders say so or not. Your Honor, we do not contend that the memorandum did not, memorandum of understanding, did not continue in force and effect. Standing alone. But the memorandum of understanding, any violation of the memorandum of understanding is not something over which the board had jurisdiction. If this case had been brought in the court of federal claims and if there was found to be a breach of either an implied in fact contract through the restrictive captions or a breach of the memorandum of understanding, these are both potential agreements concealing with the protection of proprietary information, the court of federal claims would have jurisdiction to entertain that. Do you think that taking the position you're taking is going to encourage scientists and inventors to want to deal with Army labs or other military labs and agencies to provide data and proposals and to send devices? Aren't you arguing against the interest of the sovereign here? You're going to discourage people like Wesleyan from trying to help the Army have better equipment. No, Your Honor, that's not our view at all. To the extent that there is a protective legend, to the extent there is a memorandum of understanding outside the confines of the Contract Disputes Act, it's not as if a violation of that could not be heard, could not be entertained. It certainly could be before the court of federal claims. But the board jurisdiction is confined to the terms of the Contract Disputes Act. And the Contract Disputes Act limits the types of contracts, the types of cases that can be heard to procurement contracts or contracts for the disposal of personal property. That is not what the memorandum of understanding is. It is not what any implied in fact contract based on the restrictive legends is. It is certainly not what the bailment contract that was entered into would be. Well, so far, everything you've said is agreed to by me and Mr. Morehouse and you. So why are we talking about things where we all agree? It seems like what you should address is where you and Mr. Morehouse disagree. He says they aren't separate. You say they are separate. It seems to me that's the heart of the dispute here. Therefore, presumably, the three of us have to decide, well, are they separate or are they not separate? Your Honor, I agree that that is the crux of the dispute. And the starting point for analyzing that dispute is the plain language of the purchase orders, the contract that is supposedly being breached. Because there is not a claim on which the board can exercise jurisdiction based simply on the restrictive legends, based simply on the MOU. So we need to focus on purchase orders. And what the purchase orders say. And as I say, the starting point for analyzing whether there is any breach of the purchase orders that can be heard by the board is looking at the purchase orders themselves, the plain language of the purchase orders. There's no incorporation by reference. There is no course of prior dealings between the parties. What do you mean there's no course of prior dealings? There's years of prior dealings. Back and forth, they send in an unsolicited proposal. The Army says, we can't touch this unless we work out some understandings about secrecy. They say, okay, we'll put the DAR legend on it. We'll sign the MOU. We'll do whatever you want. They do it. And then the course of conduct proceeds. They send more stuff. Two different Army labs are involved in evaluating it. In the end, Natick ends up doing most of the work. Before it can finish on deciding whether the proposal has any merit, Natick says, we need to test the real device. We can't just look at diagrams. We need to test the real device. We'll buy some from you, and they bought 33. It looks to me like it's a continuous, integrated series of transactions, a course of conduct. Your Honor, the Memorandum of Understanding, the restrictive legends, talk about protecting data. Devices were subsequently purchased. The purchase agreement, the purchase order, does not talk about protecting data. It does not talk about protecting proprietary information. It does not incorporate. Doesn't your position depend on my accepting the idea that a device does not embody technology, whereas written data, diagrams, and verbal descriptions, for example, as in a patent, would be protected? It seems to me that's nonsensical. It seems to me that when you send somebody a device that they can take apart and test and see how it works and build variations, you're giving them even more of your technology than if you send a little written disclosure with a few diagrams. I just don't understand where you're going here. Your Honor, even if it's not accepted that there's a distinction between data and a device, first of all, there is no allegation that there was a misuse of the device themselves. There's an allegation that there was a disclosure of data, but not a misuse of a device. The devices were, in fact, used for testing. And the testing of a device yields new data. They're claiming that that data was given, I think, allegedly to a competitor. I have no idea if those allegations are right or wrong. It doesn't matter. The allegation is data that came into the possession from them of the Army was improperly disclosed to somebody outside the government. True or false, that's what they're saying. And so then we have to understand, well, okay, where did this data come from? Well, we know there was an original submission of verbal data, and then there was a submission of the devices, which were then tested at the Natick Lab, which I'm assuming yields further scientific and engineering data, and that's the mass of data that they're saying was leaked. If there was some improper disclosure of data, as was alleged, that would be a violation of the Memorandum of Understanding or possibly of a restrictive legend. That's all they're charging. But there would be no violation of the purchase order itself. The purchase order was fully complied with by the Army. You paid for the devices, therefore the purchase order was not breached. They agree with that. But the purchase order is the only possible jurisdictional hook. Correct. They agree with that too. And if there is no breach of the purchase order, then there is no possible basis for jurisdiction in the board. Unless the Memorandum of Understanding merges into the sale contract, which is what I've been trying to get you to address from the start. Your Honor, if. And all you say is it's not expressly incorporated on the face of the purchase order, which is true, but you don't seem to have any other argument about why the parties, given this course of dealing over many years, wouldn't assume that there's a merger of the MOU with the purchase order. Your Honor, there is also no evidence in the record that, as was done with the original proposals, that there was any restrictive legend on the equipment itself. That's not in the record. All right. Thank you. Your time has expired, Mr. Harrington. I appreciate your taking over the case from Ms. Hogan, who's unavailable. Mr. Morehouse, you have just shy of three minutes, if you need it, for whatever rebuttal you care to make. Don't repeat anything, but anything new is worth saying. Yes, Your Honor. I would refer to the joint appendix, if I may, joint appendix at 61. This is a request for quotations, July 27th, 1984. In terms of merger of the memorandum and the purchase order, one piece of evidence I would highlight. It specifically says the FistFlex hydration system. That was the name of the system that was in the unsolicited proposal. Fist, soldier's fist, he flexes the bulb, the water shoots into the mask. That was the trade name, if you will. Whatever you want to call it at the time, that was the name of it. That clearly ties it back to the unsolicited proposal. It simply doesn't say drinking tube. It doesn't say prototype. It uses the specific name of the concept. In terms of the Board's jurisdiction, if we look back at E.M. Scott, now when we went into the Armed Services Board, we looked at its precedent in E.M. Scott, and we thought when the Board was becoming uncomfortable with that precedent that we needed to address E.M. Scott and to see the differences. In E.M. Scott, there was not a contractor. E.M. Scott was a disappointed off-roar. Wesleyan Company was an actual contractor to the government. The purchase orders are DD form 55. They are 1155. On the very back of the general provisions, they say they are subject to the Contract Disputes Act. Our argument is on the day that we walked into the Board with that complaint, the Board had jurisdiction over the case. And that's it. Thank you, Mr. Morehouse. Thank you, Mr. Harrington. We'll take the case under advisement. Jurisdiction cases so often turn out to be more difficult than cases involving the merits. It's an irony of our work. Thank you both.